UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CODY MICHAEL JOCK, TANNER RILEY JOCK,
JAKE TYLER JOCK, MICHAEL L. JOCK and
COLLEEN FARWELL as parents and legal
guardians of Cody Michael Jock, Tanner Riley
Jock and Jake Tyler Jock, LAYLA WHITE, and
CHARLES WHITE as parent and legal guardian of
Layla Whirte,

                                          Plaintiffs,

            v.                                          7:05-cv-1108

JAMES RANSOM, KATHLEEN LAUZON, EMILY
LAUZON, BEN KELLY, STACEY ADAMS,
DARLENE BROCKWAY, ROBERT DURANT,
MARION ELLIOT, JUDITH STARK, CORRINA
BERO individually and as members of the Salmon
River Central School District Board of Education,
THE SALMON RIVER CENTRAL SCHOOL DISTRICT
BOARD OF EDUCATION, THE SALMON RIVER
CENTRAL SCHOOL DISTRICT, GLENN R.
BELLINGER, Superintendent of the Salmon River
Central School District, in his official and individual
capacity, IRVING PAPINEAU, Principal of St. Regis
Mohawk School, JOHN SIMMONS, Principal of
Salmon River Central Schools, and JOHN AND JANE
DOES 1-10,

                                          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

Plaintiffs commenced the instant action pursuant to 42 U.S.C. § 1983 contending

that Defendants violated their right to the equal protection of the laws as guaranteed by the

Fourteenth Amendment to the United States Constitution when they prohibited the recitation

of the OHEN:TON KARIHWATEHKWEN (hereinafter "Thanksgiving Address" or "Address")
over the school's public address system.  Presently before the Court is Plaintiffs' motion for
partial summary judgment seeking a declaration that the Thanksgiving Address is not a
religious prayer, Defendants' cross-motion to dismiss the claims, and Defendants' motion for
summary judgment seeking dismissal of the Complaint in its entirety.

## I.       BACKGROUND

Plaintiffs are students, and/or the parents of students, enrolled in the Salmon River
School District (the "School District").  Defendants include the School District; the School
District's Board of Education; Glenn Bellinger, the School District's superintendent; Irving
Papineau, principal of the St. Regis Mohawk School; John Simmons, principal of the Salmon
River Central School District; and the individual members of the Salmon River Central School
District Board of Education.

The Thanksgiving Address embodies Mohawk tradition, history, and culture.  The
Address is spoken at the openings and closings of all Mohawk gatherings, including political,
ceremonial and sporting events, as an acknowledgment of Mohawk existence, culture, and
way of life.  While there is no single, uniform recitation of the Address, the abridged version
of the Address prepared by the School District acknowledged, in the following general order:
People, Mother Earth, Plants, Fruits, Grasses, Water, Fish, Medicine, Animals, Trees, Birds,
Grandfather Thunders, Four Winds, Elder Brother Sun, Grandmother Moon, Stars, Four
Beings, and Creator.[1]  The Address was recited over the school's public address system on

---

[1] The parties dispute the meaning of the term "creator" as used in the Address.

Monday mornings and Friday afternoons and during school events for a period of approximately 2 to 2 ½ years.

In the fall of 2004, Kathleen Lauzon, a non-Mohawk, complained to Defendant Bellinger that the Address could be a prayer.  As a follow up to Lauzon's complaint, Bellinger sought the opinion of school's attorneys.  In an April 12, 2005 letter to Bellinger, the attorneys concluded that "a court would probably determine that the recitation of the Thanksgiving Address over the school's PA system (in school, at the pep rally and lacrosse games) is impermissible under the Federal Constitution."  Def's Ex. B.  The attorneys further stated that "a student-initiated, pre-school recitation of the Thanksgiving Address in a location where students may choose to gather and participate, or not to do so, would protect the First Amendment free speech rights of those students who wish to engage in the Thanksgiving Address, while at the same time protecting the First Amendment rights of those who do not wish to participate."  Id.  Thereafter, in April or May 2005, Bellinger made the decision to relocate the Address from the public address system to the school's auditorium.  The Address also was no longer recited at pep rallies or lacrosse games.

The decision to remove the Address from the public address system and to discontinue reciting it at the pep rally and lacrosse games forms the basis of Plaintiffs' claim brought under the Equal Protection Clause.  Plaintiffs make no claims under the First Amendment.

**II.       DISCUSSION**

a.    **Standard of Review**[2]

Rule 56 of the Federal Rules of Civil Procedures governs motions for summary judgment.  It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56( c).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant is able to establish a prima facie basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A

---

[2] Before continuing, the Court pauses to note that Plaintiffs filed a litany of objections to nearly every statement made in the affidavits submitted by Defendants.  Many of these are a blanket objection based on hearsay.  Most of Plaintiffs' hearsay objections are ill-founded because the vast majority of the hearsay statements are not being offered for the truth of the matter asserted, but to establish state of mind and why a particular person acted the way they did.  As a non-exclusive example, Plaintiffs' object on hearsay grounds to paragraph 2 of Marc Czadzeck's affidavit.  That paragraph states, among other things, "I recall Ms. McDonald expressed the opinion that hearing the Address recited in Mohawk would have a benefit for her students."  Whether hearing the Address recited in Mohawk would benefit her students is irrelevant to her discussion.  Thus, this statement is not offered for the truth of the matter asserted.  What is relevant to this case is why Czadzeck permitted Ms. McDonald to play the Address over the public address system.  Plaintiffs, on the other hand, have submitted numerous hearsay statements, including newspaper articles and letters, offered to prove that the Address is not a prayer and other facts in dispute in this case.

- 4 -

party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. V. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).  With this standard in mind, the Court will address Defendants' motion for summary judgment.

### b.    Equal Protection

"To state a claim for an equal protection violation, [Plaintiffs] must allege that a government actor intentionally discriminated against them on the basis of race, national origin or gender."  Hayden v. County of Nassau, 180 F.3d 42, 48 (2d Cir. 1999).  Thus, to succeed, it is incumbent upon Plaintiffs to "prove purposeful discrimination . . . directed at an identifiable or suspect class," Giano v. Senkowski, 54 F.3d 1050, 1057 (2d Cir. 1995), in the decision to remove the Address from the public address system and to discontinue reciting it at the pep rally and lacrosse games.  "Discriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences.  It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group."  Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979).  Factors that may tend to show unlawful discriminatory intent include: (1) a clear pattern unexplainable on grounds other than race; (2) the historical background of the decisions at issue; (3) departures from normal routine by the policymakers; and (4) the administrative history of the action.  Arlington Heights v. Metropolitan Housing Corp., 429 U.S. 252, 266-68 (1977).

Most of Plaintiffs' submissions, both in support of their motion for partial summary judgment and in opposition to Defendants' two motions, focus on whether the Address is a

prayer.  The resolution of that complex issue is not necessary to the disposition of this case.

Accordingly, the Court declines to opine whether the Address is a prayer.[3]  Instead, the Court

will focus on the merits of Plaintiffs' equal protection claim.  The question is whether Plaintiffs

have proffered sufficient evidence upon which a fair-minded trier of fact could reasonably

conclude that Defendants removed the Address from the public address system or other

school events on account of Plaintiffs' race or national origin.[4]

### 1.    Disparate Treatment

One way Plaintiffs may demonstrative unlawful discrimination is by showing that

they were treated differently from similarly situated persons or groups.  See Phillips v.

Girdich, 408 F.3d 124, 129 (2d Cir. 2005); Annis v. County of Westchester, 136 F.3d 239,

245 (2d Cir. 1998).  "When considering whether . . . [plaintiffs have] raised an inference of

discrimination by showing that . . . [they were] subjected to disparate treatment, . . . the

plaintiff[s] must show . . . [they were] similarly situated in all material respects to the

individuals with whom [they] seek[] to compare [themselves]."  Graham v. Long Island R.R.,

230 F.3d 34, 39 (2d Cir. 2000) (discussing the concept of "similarly situated" in the Title VII

context) (internal quotations omitted).

In support of their claim of disparate treatment, Plaintiffs point to the fact that

Defendants "endorse daily recitation of the Pledge of Allegiance" over the school's public

address system,  Pl.'s Mem. of Law at 17.  However, Plaintiffs fail to identify what similarly

---

[3] Consequently, Plaintiffs' motion for partial summary judgment seeking a declaration that the Address is not a prayer is denied.  Any opinion the Court would have on that matter would be an unnecessary advisory opinion.

[4] For purposes of the ensuing discussion, the Court looks at the evidence in the light most favorable to Plaintiffs and will accept, without deciding, their contention that the Address is not a prayer, but "a cultural statement of Mohawk community values,"  Pl.'s Mem. of Law at 5.

situated other group is at issue with respect to the Pledge of Allegiance (hereinafter, the "Pledge").

The Pledge was implemented pursuant to the recommendations of state law. See N.Y. Educ. Law § 802(1); 8 N.Y.C.R.R. § 108.5. The Pledge "evolved as a common public acknowledgment of the ideals that our flag symbolizes. Its recitation is a patriotic exercise designed to foster national unity and pride in those principles." See Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 6 (2004); id. at 31 (Rehnquist dissenting) (The Pledge of Allegiance "is a declaration of believe in allegiance and loyalty to the United States flag and the Republic that it represents"). As such, the Pledge of Allegiance arguably pertains to all persons interested in national unity and/or pride in the United States including Plaintiffs and/or other Mohawks.[5] The Pledge's applicability is not limited to a discrete group within the United States, or to persons of a particular race, religion, or national origin, but to all persons who wish to acknowledge the ideals that our flag symbolizes regardless of race, color, religion, age, national origin, gender, sexual orientation, disability, or any classification in which we ordinarily see discrimination claims.

The Address, on the other hand, pertains only to the Mohawk.[6] Comparing a recitation that applies to all persons wishing to express their support for the United States

---

[5] As citizens of the United States, see 8 U.S.C.A. § 1401 (providing that "a person born in the United States to a member of an Indian . . . or other aboriginal tribe" is a United States citizen at birth). some Mohawks may feel a sense of national unity or pride. The Court makes no determination whether Mohawks do, or do not, feel a sense of national unity or pride in the United States. Although the Pledge references "God," Plaintiffs have stated that they are not challenging the Pledge or its recitation over the school's public address system, but merely using it to compare the Address.

[6] According to Plaintiffs, the Address "embodies Mohawk tradition, history and culture" and is recited at the opening and closing of all Mohawk gatherings as an acknowledgment of Mohawk existence, culture, and way of life. Pl.'s Stmnt. of Mat. Facts in Support of Partial Summ. J. at ¶¶ 1, 3. Plaintiffs make no claim that the Address is intended to apply to anyone other than the Mohawk.

regardless of race, religion or national origin (the Pledge of Allegiance) with a recitation applicable only to a specific race found within the United States (the Address) does not permit an inference of race-based discrimination.  Stated otherwise, Plaintiffs cannot rely upon a comparison between treatment on account of national pride with treatment on account of race or national origin to create an inference of discrimination.  This is because "[t]he first legal question that arises in [equal protection] cases is whether the similarity between the circumstances of the plaintiff and those of the comparators tends to prove that race [or national origin] was a factor in the difference treatment."  Neilson v. D'Angelis, 409 F.3d 100, 105 (2d Cir. 2005); see also Deravin v. Kerik, 335 F.3d 195, 202 (2d Cir. 2003) ("For example, read liberally, allegations by an African-American employee that employees of Irish descent are receiving preferential treatment implicitly suggests some form of potential racial discrimination in addition to an illegitimate preference premised on national origin."); Zimmerman v. Assoc's First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001) (noting that, in an employment discrimination case, the "fact that a plaintiff was replaced by someone *outside* the protected class will suffice for the required inference of discrimination.") (emphasis added).  Comparing different types of protected classes with one another (e.g. religion with race, or gender with race) does not permit any rational inferences that would tend to prove that race, national origin, or membership in any other protected class was a factor in any claimed differential treatment.  Rather, inferences can only be reasonably drawn when comparing apples to apples; that is, one person's race with that of another, one person's gender with that of another, one person's national origin with that of another, etc. See  United States v. Armstrong, 517 U.S. 456, 458 (1996) (noting that in a *race* discrimination case, the plaintiff must show that the government acted disparately towards

persons of other *races*) (emphasis added); id. at 465 ("To establish a discriminatory effect in a *race* case [alleging selective prosecution], the claimant must show that similarly situated individuals *of a different race* were not prosecuted.") (emphasis added); Neilson, 409 F.3d at 105 (noting that "where a plaintiff claims, for example, *racial discrimination* in employment, the plaintiff may present evidence of the treatment of employees *of other races* as a basis for the trier of fact to infer that the different treatment meted out to the plaintiff was based on race.") (emphasis added); Lizardo v. Denny's Inc., 270 F.3d 94, 101 (2d Cir. 2001) ("When plaintiffs seek to draw inferences of discrimination by showing that they were similarly situated in all material aspects to the individuals to whom they compare themselves, their circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances. . . . What is key is that they be similar in significant respects.") (internal quotations and citation omitted).

Plaintiffs similarly cannot create an inference of discrimination by comparing treatment affecting the Mohawk (removal of the Address) with that afforded to a class that includes members of their own group (the Pledge).  See Murray v. Gilmore, 406 F.3d 708, 715 (D.C. Cir. 2005) (Noting that, in considering a job discrimination claim, "a replacement within the same protected class cuts strongly against any inference of discrimination,"); Brown v. McLean, 159 F.3d 898, 905 (4th Cir. 1998) ("In order to make out a prima facie case of discriminatory termination, a plaintiff must ordinarily show that the position ultimately was filled by someone not a member of the protected class."); Howley v. Town of Stratford, 217 F.3d 141, 150 (2d Cir. 2000) ("Circumstances from which invidious discrimination may be inferred include preferential treatment given to employees *outside* the protected class.") (emphasis added); see also Weiss v. La Suisse, 260 F. Supp.2d 644, 655 (S.D.N.Y. 2003)

("Different treatment of similarly situated persons within the same protected class does not create an inference of discrimination."); Montanile v. National Broadcast Co., 211 F. Supp.2d 481, 487 (S.D.N.Y. 2002) ("That a plaintiff is replaced by another in the same protected class weighs heavily against the inference that she suffered discrimination.").  While some Mohawk may not endorse the Pledge, Plaintiffs offer insufficient evidence indicating that, generally speaking, Mohawks do not endorse recitation of the Pledge. See Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639 (3d Cir. 1998) ("[J]ust as an employer cannot insulate itself from claims of racial discrimination by identifying a token black person whom it treated with abnormal leniency, a black plaintiff cannot establish racial discrimination by singling out one white person who was treated more favorably when there were other white persons who were treated less favorably than other black persons.").

        c.        **Other Evidence of Discriminatory Intent**

Plaintiffs also make other arguments in support of their contention that the District's removal of the Address from the public address system and other school events was done on account of Plaintiffs' race.  Plaintiffs contend that the District removed the Mohawk Address while "District students must participate in other non-Mohawk cultural practices," Pl.'s Mem. of Law at 17, such as being "encouraged to celebrate Christmas, Thanksgiving, and various other Christian and American-based holidays.[7]  They are taught and encouraged to sing Christmas Carols and hymns such as Amazing Grace."  Farwell Decl. at ¶ 9.  Plaintiffs again fail to identify differential treatment.  According to Plaintiffs, the Address is not

---

[7] The evidence in this regard is scant and is found only in the affidavit of a parent of a student enrolled in the District.  There is no evidence regarding the extent of any District encouragement concerning the celebration of Thanksgiving, Christmas, or any other events or holidays.

religious.  A comparison between the Address and religious activities, therefore, does not suggest impermissible discrimination.  Further, with respect to Thanksgiving, akin to the situation discussed above with respect to the Pledge of Allegiance, that is an American holiday applicable to persons regardless of race, national origin, or religion.  As with the Pledge, Thanksgiving is not religious and is not related to a specific group or culture within the United States, but to all persons supportive of this nation or otherwise wishing to recognize the values of the Thanksgiving holiday.  Moreover, there is no indication that Christmas carols or hymns such as Amazing Grace are played over the District's public address system, before lacrosse games, or at pep rallies.

Further, nothing about the District's "celebration" of Christmas, Thanksgiving, or other American based holidays suggests impermissible discrimination against Plaintiffs.  As an initial matter, there is little evidence in the record regarding the manner, or extent to which, these holidays are celebrated by the District.  In any event, the only reasonable conclusion is that the District has attempted to promote diversity, pluralism, and tolerance, including Mohawk culture and tradition.  Assuming the District does celebrate Christmas, Thanksgiving and other American holiday, there is undisputed evidence in the record that the District also celebrates Mohawk culture.  For example, the District: allows the Address to be recited in the school auditorium; allows students to wear traditional Native dress to graduation; designated "Native American Day" as a District-wide holiday that is preceded by a week-long, in school celebration of Native traditions such as meals, assemblies, presentations, and the promotion of Native language; engages a Native language interpreter for the "Book of the Month;" instituted a Mohawk language program; pursued grants that offer Native American student field trips; displayed the American, Canadian, and Native American

flags; etc.  Def.'s Stmnt. Mat. Facts at ¶ 19.[8]  Indeed, in their Statement of Material Facts, Plaintiffs expressly claim that the District initially permitted the Address to be recited over the public address system "for the pedagogical purpose of exposing District students to Mohawk language and culture."  Pls' Stmnt. of Mat. Facts at ¶ 9.  Thus, just as the District may include celebrations of Christmas, Thanksgiving, or other American-based holidays, it also celebrates Mohawk tradition and culture.  The Court, therefore, finds that there is insufficient evidence concerning the District's treatment of other holidays or cultures from which a fair-minded trier of fact could reasonably infer that the decision to remove the Address from the public address system or other school events was because Plaintiffs are Mohawk.

The very reason the Address came to be played over the District's public address system in the first instance weighs against a finding of discrimination.  The undisputed record evidence is that former Salmon River Central High School principal Mark Czadzeck allowed the Address to be recited over the school's public address system when he was asked permission to do so by Mary McDonald, the school's former Mohawk language teacher.  Czadzeck Aff. at ¶ 2.[9]

---

[8] In their responsive statement of material facts, Plaintiffs do not deny that these activities occur in the District, but claim that "[t]he acts and/or events described are not the result of Board of Education and/or District initiatives.  Instead, these acts are either the District's response to the Mohawk community organizing or acts taken to obtain increased federal funding for the District."  Regardless of whether these acts and/or events were at the initiative of the District or agreed to by the District as a result of efforts by the Mohawk community, these acts and/or events are indicative of efforts to incorporate (rather than exclude) Mohawk culture into the school district and are not evidence of intentional discrimination against the Mohawk.

[9] There also is evidence in the record that a non-Mohawk student requested access to the District's public address system to offer a special religious quote of the day.  Bellinger Aff. at ¶ 4.  This request was denied. Id.  This evidence tends to support the District's position that it removed the Address upon the belief that it was religious in nature and not because it was of Mohawk origin.

Plaintiffs next attempt to find intentional discrimination in the District's reliance upon the opinion of the District's attorneys.  Plaintiffs spend considerable effort attacking the attorneys' conclusions that the Address could be considered a prayer.  The attorneys concluded that continuing to play the Address over the public address system could run afoul of the Establishment Clause of the First Amendment, thereby exposing the District to liability.  Specifically, the attorneys opined that:

> It is our opinion that a court would probably determine that the recitation of the Thanksgiving Address over the school's PA system (in school, at the pep rally and lacrosse games) is impermissible under the Federal Constitution.  However, a student-initiated pre-school recitation of the Thanksgiving Address in a location where students may choose to gather and participate, or not to do so, would protect the First Amendment free speech rights of those students who wish to engage in the Thanksgiving Address, while at the same time protecting the First Amendment rights of those who do not wish to participate.

Apr. 12, 2005 Ferrara Law Firm Letter, p. 4.  While relying on the advice of counsel is not, in and of itself, a defense to a discrimination claim, it goes to the issue of Defendants' intent.  Weissman v. Dawn Joy Fashions, Inc., 214 F.3d 224, 234 n.4 (2d Cir. 2000) ("[C]onsultation with counsel might show that the defendant lacked the subjective intent to [discriminate]."); Acumed LLC v. Stryker Corp., 483 F.3d 800, 810 (noting in a claim of willful patent infringement that opinions of counsel "normally present a well-grounded defense to willfulness.");[10] see also United States v. Roti, 484 F.3d 934, 935 (7th Cir. 2007) ("Advice of

---

[10] The Court finds that the cases relied upon by Plaintiffs are largely inapposite because they all concern a special rule in patent law "that an important factor in determining whether willful infringement has been shown is whether or not the infringer obtained the opinion of counsel."  Comark Communications, Inc. v. Harris Corp., 156 F.3d 1182, 1191 (Fed. Cir. 1998).  This rule is specific to patent law based on the notion that "[w]here an infringer has actual notice of a patentee's rights, the infringer has an affirmative duty of due care . . . which normally includes the duty to seek and obtain competent legal advice from counsel regarding the potential infringement."  Nevertheless, even in the patent cases, it is noted that "an opinion of counsel letter is an important factor in determining the willfulness of infringement[.] [I]t's important does not depend upon its legal correctness.  Indeed, the

(continued...)

counsel is not a free-standing defense, though a lawyer's fully informed opinion that certain conduct is lawful (followed by conduct strictly in compliance with that opinion) can negate the mental state required for some crimes. . . ."); Hultgren v. County of Lancaster, Neb., 913 F.2d 498, 507-08 (8th Cir. 1990) ("The county would be entitled to a good faith defense based on reliance on the opinions letters, *if* its actions actually conformed with the letters *and* were objective reasonable."). Of course, Defendants' intent is a central focus of Plaintiffs' Equal Protection claim. Rivera-Powell v. New York City Bd. of Elections, 470 F.3d 458, 470 (2d Cir. 2006) ("In order to establish . . . a constitutional violation, [plaintiffs] would have to show that the [defendant] intentionally discriminated against [them].").

In the criminal context, it has been said that "[t]he advice-of-counsel defense requires a defendant to establish the following elements: (1) before taking action, (2) he in good faith sought the advice of an attorney whom he considered competent, (3) for the purpose of securing advice on the lawfulness of his possible future conduct, (4) and made a full and accurate report to his attorney of all material facts which the defendant knew, (5) and acted strictly in accordance with the advice of his attorney who had been given a full report." United States v. Al-Shahin, 474 F.3d 941, 947 (7th Cir. 2007); see also Janeiro v. Urological Surgery Professional Ass'n., 457 F.3d 130, 140 (1st Cir. 2006); United States v. Rice, 449 F.3d 887, 897 (8th Cir. 2006); United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181 (2d Cir. 1989) (Noting that, the "thrust" of the "advice-of-counsel defense" "is that the defendant, on the basis of counsel's advice, believed his conduct to be lawful and thus could not be

---

[10](...continued)
question arises only where counsel was wrong. . . . [C]ounsel's opinion must be thorough enough, as combined with other factors, to instill a belief in the infringer that a court might reasonably hold the patent is invalid, not infringed, or unenforceable." Id.

found to have had unlawful intent. . . . [A] defendant would rely on an advice-of-counsel defense is required to have disclosed all pertinent information in his possession to his attorney."). In this case, Plaintiffs use the school's attorneys' opinion in an effort to show unlawful discrimination. In their papers in opposition to Plaintiffs' motion for partial summary judgment and in support of their motion for summary judgment, Defendants do not assert reliance upon the advice of counsel as a defense. Accordingly, the burden is not on Defendants to assert reliance of counsel as a defense, but upon Plaintiffs to demonstrate that Defendants used the opinion letter as a pretext for unlawful discrimination or as otherwise indicative of unlawful discrimination.

The Court finds that Plaintiffs have failed to proffer evidence demonstrating that Defendants do not meet the standards of the advice-of-counsel defense, thereby further detracting from any claim of impermissible discrimination. The First, Third, Fourth, and Fifth elements are readily satisfied in favor of Defendants. With respect to the first element, the District sought the advice of counsel before taking any action with respect to the Address. With respect to the third element, Plaintiffs point to no evidence suggesting that Defendant Bellinger sought legal advice for any reason other than to determine the legality of continuing to recite the Address over the Public Address system and at other District events.[11] Turning to the fourth element, there is no claim that Bellinger withheld any material information from

---

[11] To the contrary, the "tone" of Bellinger's memorandum to the District's attorneys suggests that he did not believe the Address to raise an issue of prayer. In his memorandum, Bellinger wrote, "QUESTION/ISSUE: Is this considered a form of prayer. . . . Some people want to make it an issue of prayer. . . . NOW. . . After it has been done for over three years now. Looking for response." Pls. App. 309. It is undisputed that the person making an issue out of the Address was Kathleen Lauzon, a parent and member of the Board of Education. Pls' Mem. of Law in Support of Motion for Partial S.J. and in Opp. to Defs.' motion to Dismiss and for S.J. at 20; Pls.' Stmnt. of Mat. Facts at ¶ 13, 14; Lauzon Aff. at ¶ 4; Pls.' Mem. of Law in Support of Motion for Partial S.J. at 1.

the District's attorneys.  It is clear from Bellinger's memorandum to the attorneys that he was submitting an English translation of an address recited over the public address system in the Mohawk language, that the address is recited twice a week (once at the beginning of the week and once at the end), that the address also is recited at "pep assemblies" throughout the year, and that "some people want to make it an issue of prayer . . . NOW . . . after it has been done for over three years."  The District also informed its attorneys that the practice started at the behest of the Mohawk language class.  Plaintiffs do not point to any material information that Bellinger withheld from the attorneys.[12]  Plaintiffs similarly do not point to any evidence suggesting that Bellinger did not otherwise make a full and accurate disclosure to the attorneys of all material facts that he knew.[13]

Turning to the fifth element, the evidence unequivocally demonstrates that Defendants acted in strict accordance with their attorneys' advice.  As previously noted, in their opinion letter, the attorneys opined that reciting the address over the public address

---

[12] Arguably, Bellinger may have neglected to tell the attorneys that he was providing a full copy of the Address, whereas the students recited an abbreviated version over the public address system. Plaintiffs fail to demonstrate how any such omission is material to the issue presented to the attorneys.

[13] The undisputed evidence before the Court is that, upon receiving a letter of complaint from Kathleen Lauzon, Defendant Bellinger contacted the District's attorney about Lauzon's concern.  In his October 7, 2004 memorandum to the District's attorney, Bellinger wrote:

THANKSGIVING ADDRESS (Attachment #2): Enclosed please find the English interpretation of an address that is done over the loud speakers in Mohawk Language during Monday morning announcements, as well as a closing on Friday afternoon announcements, along with what is stated at pep assemblies throughout the school year. QUESTION/ISSUE: Is this considered a form of prayer. . . . Some people want to make it an issue of prayer. . . . NOW. . . After it has been done for over three years now. Looking for response.

Note: School population is 57% Native-American; 43% White.

Pls. App. 309; see also n. 11 supra.

- 16 -

system could expose the District to liability under the Establishment Clause, but that the District could accommodate Free Speech and Establishment Clause concerns by relocating the Address to "a location where students may choose to gather and participate, or not to do so." This is exactly what the District did. It relocated the Address to the auditorium and permitted students to go to the auditorium if they wished to participate in the recitation of the Address. Similarly, before the graduation ceremony, the District permitted students to recite the Address in the cafeteria where they line up for graduation.

That leaves the issue of the second element - whether Bellinger in good faith sought the advice of attorneys whom he considered competent. Plaintiffs fail to point to sufficient evidence demonstrating that Defendants did not act in good faith to seek the advice of attorneys whom it considered competent. Bellinger testified at deposition that he used the particular law firm at issue because "[i]t is a well-established firm out of Syracuse." Pls' App. at 524. There is no evidence in the record disputing this. Rather, Plaintiffs submit evidence challenging the attorneys' conclusion that the Address could be considered a prayer and contend that Defendants should have consulted attorneys who are experts in constitutional law and Native American culture.

Nothing in the record suggests Defendants had reason to believe that the District's attorneys were not competent. The Court rejects Plaintiffs' suggestions that the District was obliged to find experts in Native American law, constitutional law, or the Mohawk language. The reliance upon counsel rule speaks nothing of seeking out "experts," but only of consulting with "competent" counsel.

Plaintiffs attack the District's attorneys' competence by challenging the correctness of their opinion letter. This is not a proper way to attack Defendants' reliance on counsel.

The correct focus is at the time Defendants sought legal advice and whether Defendants had reason to believe that the opinion letter was incompetent.  The Court finds that Defendants, who are not lawyers or experts in the First Amendment, did not have reason to believe that the District's attorneys could not, and did not, provide competent legal advice.

Even assuming the District's attorneys were wrong, their opinion was not so plainly incompetent[14] as to alert a person of reasonable caution that their legal advice was incorrect and, therefore, does not give rise to an inference of intentional discrimination.  The evidence demonstrates that the District and its attorneys were concerned with whether the Address constituted a prayer that might violate the Establishment Clause.  Although the attorneys were aware that the Address was Mohawk, there is insufficient indication in the record suggesting that their opinion was formed *because* the Address was Mohawk or *because* of the effect its removal from the school would have on the Mohawk.  Cf Farias v. Instructional Systems, Inc., 259 F.3d 91, 100 (2d Cir. 2001) (finding that the advice of counsel did not afford a defense in a retaliation claim because "[c]ounsel's advice that [the employer] should not offer [the employee] the severance package offered to everyone else *because* [the employee] had filed an EEOC complaint," tended to support the claim of retaliation); Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 467 (2d Cir. 1989) (Finding that, in an employment discrimination case where the employer consulted counsel *after* taking certain actions against the employees, a jury could infer "from the sequence itself" that treatment of the employees was "not based on the merits of their own performance but were merely strategic afterthoughts designed to make discriminatory treatment already given. . . .").

---

[14] The Court does not intend to intimate that the attorneys' opinion was incompetent in any way.

Assuming the Address is unique to the Mohawk, it does not follow that the District's, or its attorneys', conclusions were made because the Address was Mohawk.  Rather, the evidence reveals that the attorneys' opinion was formed upon the belief that the Address *could* be found to be religious in nature, which *could* expose the District to liability under the First Amendment.  There is insufficient evidence in the record upon which a fair-minded trier of fact could reasonably conclude that Defendants obtained an opinion letter from its attorneys for the purpose of concocting a justification, or pretext, for removing the Address from the public address system or other school events.  In other words, under the facts and circumstances of this case, resort to legal opinion, even if that legal opinion proved  to be faulty, is not a reasonable basis upon which to infer intentional discrimination.

It must be borne in mind that the issue before the Court is not whether the District's attorneys were correct, but whether it was reasonable for Defendants to rely on the attorneys' opinion.  Plaintiffs' attacks on the opinion letter do not suggest unreasonable reliance.  Plaintiffs do little to attack the legal analysis in the opinion letter.  Plaintiffs do argue that, in light of Newdow v. Elk Grove Unified School Dist., 292 F.3d 597 (9th Cir. 2003), reh. denied, 328 F.3d 466, in which the Ninth Circuit found the words "under God" in the Pledge of Allegiance to violate the Establishment Clause, the attorneys should have treated the Pledge and the Address the same.  There are several problems with this argument.  First, for reasons previously discussed, the Pledge and the Address are not readily comparable.  Second, the judgment of the Ninth Circuit in Newdow was reversed by the United States Supreme Court.  Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1 (2004).  While the

Supreme Court did not address the constitutionality of the Pledge,[15] it found that the plaintiff did not have standing to challenge the recitation of the Pledge. Because the plaintiff did not have standing, the Ninth Circuit's opinion concerning the constitutionality of the Pledge became *dicta*[16] and did not compel a particular conclusion in the issue facing the District's attorneys.[17]  Third, even if Newdow was not reversed by the Supreme Court, it is not controlling in this Circuit.  Fourth, Defendants (none of whom are attorneys) can not, and should not, be expected to be familiar with case law concerning, or the nuances of, the Establishment Clause, let alone decisions from the Ninth Circuit.  That is precisely why Defendants sought advice from their attorneys.

Plaintiffs' major contention is that the District's attorneys did not properly understand the import of the Address or research its meaning before forming his opinion that the Address could be considered a prayer.  Plaintiffs contend that it was insufficient for the attorneys to consult a dictionary to determine the definition of "prayer," that the attorneys should not have relied on various websites, and the attorneys failed to consult with Mohawks or Mohawk cultural experts.  There is an insufficient basis upon which Defendants had reason, or reasonably should have had reason, to believe that the attorneys' advice was incompetent.

---

[15] In a concurring opinion, three of the Justices concluded that recitation of the Pledge would not violate the Establishment Clause.

[16] Since that time, at least one circuit court has found that a statute requiring daily, voluntary recitation of the Pledge does not violate the Establishment Clause.  Myers v. Loudoun County Public Schools, 418 F.3d 395 (4th Cir. 2005).

[17] It is somewhat troubling that in 2007, well after the Supreme Court's decision in Newdow, Plaintiffs' counsel made the representation at Bellinger's deposition that "there is a Ninth Circuit decision . . . where the Ninth Circuit held that . . . the Pledge of Allegiance was a prayer," and that there is "authority by a court specifically holding that the Pledge of Allegiance is a prayer."  Of course, in light of the Supreme Court's decision, this is a false statement.

Whether a practice violates that Establishment Clause entails consideration of, among other things, "whether a reasonable observer would find that [the practice] had the effect of endorsing religion. . . . The reasonable-observer test is an objective standard." Altman v. Bedford Central School Dist., 2445 F.3d 49, 75 (2d Cir. 2001) (citing County of Allegheny v. ACLU, 492 U.S. 573, 620, 109 S. Ct. 3086 (1989) and Americans United for Separation of Church and State v. City of Grand Rapids, 980 F.2d 1538, 1553 (6th Cir. 1992)).  A reasonable observer must be "fully cognizant of the history, ubiquity, and context of the practice in question."  Skoros v. City of New York, 437 F.3d 1, 24 (2d Cir. 2006) (citing Justice O'Connor's concurrence in Newdow, 542 U.S. at 34).  Nobody, let alone this Court, is qualified to render an opinion as to what constitutes prayer to another.  See Alvarado v. City of San Jose, 94 F.3d 1223, 1227 (9th Cir. 1996) ("Attempting to define religion, in general and for the purposes of the Establishment Clause, is a notoriously difficult, if not impossible, task.").  Nevertheless, the Court must undertake to make an assessment as to whether reciting the Address over the public address system or at other school events might reasonably be seen as endorsing religion.

The Court agrees with Plaintiffs that the intent in playing the Address at school likely was not to endorse religion.  The Court finds, however, that it was not unreasonable for Defendants to believe the District's attorneys' opinion that an Address that is recited twice a week during school (once at the beginning of the week and once at the end of the week) and at pep rallies, graduation ceremonies, and lacrosse games could be considered prayer or the endorsement of religion.  See Santa Fe Independent Sch. Dist. v. Doe, 530 U.S. 290, 308 (2000) (noting that "an objective Santa Fe High School student will unquestionably perceive the pregame prayer as stamped with her school's seal of approval").  While Plaintiffs point to

a letter by James Ransom, Tribal Chief, to the District's attorneys in support of their claim that the Address is not religious, that letter at least supports the notion that a conclusion that the Address is religious is not unreasonable.  For example, in his letter, Chief Ransom acknowledges that "anthropologists and others tend to focus on only one aspect of [the address] and that is its use to open and close ceremonies conducted in the longhouse. Therefore, *most of the written references to it are within the context of a discussion of the spiritual and religious connotations of it*."  Pls.' A. 37 (emphasis added).  Chief Ransom continues to state that "the words [in the Address] are very powerful and its use has never been restricted to *just religious purposes*.  This historical plurality in use is referenced by Anthropologists such as William N. Fenton as he describes the dual use of the words to both open public gatherings and *preface every day religious celebration.*"  Id. at A.37-38 (underlining in original, italics added).  Chief Ransom then explains that the use of the Address in the District was not religious in nature, but to help students develop knowledge of and respect for diverse cultural heritages.  Id.  Again, while Plaintiffs and Chief Ransom may be correct in their interpretation of what the Address means and why it was recited at the District, it demonstrates that reliance upon the attorneys' opinion was not unreasonable.[18] Just as one or several persons' opinions or interpretations that a practice is religious in nature does not necessarily make it so, one or several persons' claims that a practice is not religious does not necessarily make it so.

---

[18] As Plaintiffs' purported expert Dr. Christopher Jocks explains in his affidavit, "[o]ne simply cannot gain an accurate understanding of what goes on in Indian Country without living in and around an Indian community for a long period of time."  It cannot reasonably be expected that the District's attorneys should have lived "in and around an Indian community for a long period of time" before forming his opinions or that the District was obligated to find attorney who have so lived.

In light of our usual or typical understandings of religion and prayer (which understandings admittedly may be incorrect when applied to the Mohawk), an address describing "the relationship between the Mohawks and their relationship with the earth," Alfred Aff. at ¶ 5(C), and referencing a word that is frequently translated as "creator", id., is indicative of religion.  See Lynch v. Donnell, 465 U.S. 668, 691-92 (1984) ("A government practice has the effect of impermissibly advancing or disapproving of religion if it is 'sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by nonadherents as a disapproval, of their individual religious choices.'") (O'Connor, Jr., concurring) (quoting School Dist. of Grand Rapids v. Ball, 473 U.S. 373, 390, 105 S. Ct. 3216, 3226 (1985)).  Moreover, while there may be no concept of God in traditional Mohawk existence, Alfred Aff. at ¶ 5(C), "a reference to the idea that the order of nature which supports life on earth [and] allows humans to exist," id., can reasonably be understood to be of a religious nature, at least when viewed from someone from one of the major faiths.  Ball, 473 at 390.  A reasonable person might believe that "the life forces of creation" referenced in the Address, id., are akin to religious beliefs.  The same can be said for recognition to "the creative force that provides for the perennial recurrence of life in nature" or for "mystery for the perpetual appearance of life on the earth, plant life, fruits and vegetables, water and the life in the waters of the earth, meteorological events like winds and thunderstorms, and celestial phenomenon like northern lights, moon, sun, and stars." Doxxtater Aff. at ¶ 5(c).  Such phenomenon are things reasonably understood as being connected with religion.  While such a conclusion may be incorrect from the viewpoint of the Mohawk, a conclusion that this is of a religious nature is not unreasonable.  Moreover, given the Mohawk majority in the school district, a reasonable person might infer endorsement by

the District.  At the very least, reasonable minds could disagree.[19]  Thus, the Court finds that it was not unreasonable for Defendants to reply on his opinion letter.  Defendants' reliance on its attorneys' opinion letter serves to negate any indication of intentional discrimination.

Significantly, it is important to recall that the District did not forbid recitation of the Address on school grounds.  While the District did preclude its recitation from those events that reasonably could be understood as being endorsed by the school (the public address system, graduation ceremonies, before sporting events, etc.), see Santa Fe Independent Sch. Dist., 530 U.S. at 308, it specifically provided a venue (the auditorium) where students could recite the Address if they so chose, including allowing its recitation in the gymnasium to commence and conclude each week and allowing its recitation in the cafeteria where the students lined up before the graduation ceremony.  Pls.' App. at 518.  The District also allowed students to check into home room and then go to the Auditorium to recite the Address and to "leave their class a little bit early to go down" to the auditorium to recite the Address.  Id. at 533.[20]

## III.    CONCLUSION

In conclusion, assuming that the Address is not religious and further assuming that Defendants incorrectly concluded that the Address was religious, there is insufficient evidence suggesting that it was removed from the District's public address system and other District events *because* it was Mohawk.  The undisputed evidence is that Defendant Kathleen Lauzon, a parent and Board of Education member, raised concern about the Address with

---

[19] For this reason, the individual Defendants are entitled to qualified immunity.

[20] In addition, after the commencement of this litigation, Defendants partially reinstated public recitation of the Address on the first and last day of each season and during certain school events.

Bellinger.  Bellinger then sought advice from the District's attorneys.  In strict accordance with the attorneys' advice, Bellinger restricted, but did not prohibit, recitation of the Address at school.  While Defendants may have been wrong about their conclusions and/or assumptions, a fair-minded trier of fact could only reasonably conclude that Defendants acted because of their belief that the Address might be considered religious and, therefore, in violation of the Establishment Clause.  Plaintiffs fail to point to sufficient evidence demonstrating an intent by Defendants to discriminate against Plaintiffs on account of their being Mohawk.  Accordingly, Plaintiffs' motion for partial summary judgment is DENIED, and Defendants' cross-motion [Dkt. No. 73] and motion for summary judgment [Dkt. No. 96] are GRANTED and the Complaint is DISMISSED in its entirety.  The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

Dated:   June 28, 2007

Thomas J. McAvoy
Senior, U.S. District Judge